UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| RICHARD SNYDER,<br><br>    Plaintiff,<br><br>  v.<br><br>DEPARTMENT OF DEFENSE, et al.,<br><br>    Defendants. | Case No.  14-cv-01746-KAW<br><br>**ORDER GRANTING DEFENDANTS' CROSS-MOTION FOR SUMMARY JUDGMENT AND DENYING PLAINTIFF'S CROSS-MOTION FOR SUMMARY JUDGMENT**<br><br>Re: Dkt. Nos. 63, 68 |

The parties to this case have filed cross-motions for summary judgment. The Court held a hearing on the matter on December 17, 2015. For the reasons set forth below, Defendants' cross-motion for summary judgment is GRANTED, and Plaintiff's motion for summary judgment is DENIED.

### I.   BACKGROUND

**A.   Factual background**

    1.   The CAGE Code File

On December 6, 2013,[1] Plaintiff Richard Snyder requested a copy of the Commercial and Government Entity ("CAGE") Code[2] File pursuant to the Freedom of Information Act ("FOIA"), 5

---

[1] In his complaint, Plaintiff alleges that he requested the file on December 4, 2013. (Am. Compl. ("FAC"), Dkt. No. 16.

[2] "CAGE codes . . . establish the identity of a legal entity for contractual purposes." *Raymond Express Int'l, LLC v. United States*, --- Fed. Cl. ---, ---, No. 15-1088 C, 2015 WL 7289340, at *7 (Fed. Cl. Nov. 18, 2015). A CAGE code consists of a five character identifier, and the CAGE Code file contains additional information including a company's name, address, and other entity-related information. Mansfield Decl. ¶ 4.

U.S.C. § 552.  (Defs.' Mot. Summ. J., Ex. A, Mansfield Decl. ¶ 3, Dkt. No. 68-1.)  Plaintiff has requested this file on a quarterly basis, and since 2008, it has been transmitted to him by pushing the file via File Transfer Protocol ("FTP") without incident.  (Mansfield Decl. ¶ 5.)  FTP is a method of transferring files from one computer to another, and in this instance, from a Defense Information Systems Agency ("DISA") mainframe to Plaintiff's computer.  (*Id.* ¶ 5.)  This involves directly connecting a Defense Information Systems Agency ("DISA") mainframe to Plaintiff's computer and pushing the file.  (*Id.*)  This process is initiated by a Defense Logistics Agency ("DLA") Tailored Data Products ("TDP") technician.  (*Id.*)

On January 13, 2014, a TDP technician attempted to push the file via FTP to Plaintiff.  (Mansfield Decl. ¶ 6.)  After making 13 unsuccessful attempts, the TDP technician indicated that a connection was established with Plaintiff's system, but would drop after a small portion of the file (less than 10 megabytes) was transmitted.  (*Id.*)  The technician requested that Plaintiff be contacted so that he could make additional storage space available on his system.  (*Id.*)  When contacted on January 14, 2014, Plaintiff insisted that the problem was due to "'changes to security code'" on the Government's system, as he had sufficient space on his system to accommodate the file.  (*Id.*)

On January 15, 2014, a second TDP technician attempted the FTP push at least 20 times, to no avail.  (*Id.*)  More attempts were made on January 16, 2014, but the transmission failed after a few megabytes of information were transferred.  (*Id.*)  Following these unsuccessful attempts to push the file to Plaintiff via FTP, the FOIA Officer for the DLA contacted Information Operations, which provides technical support to the DOD/DLA.  (*Id.* ¶¶ 6, 7.)

On January 28, 2014, Plaintiff and four DLA Information Services employees participated in a conference call to discuss the possible reasons for the failed FTP transmissions.  (*Id.* ¶ 8.)  During the call, Plaintiff was not receptive to the staff's suggestions, and he maintained that DISA security changes were to blame for the failed transfers.  (*Id.*)  He refused to discuss or troubleshoot any issues on his system or with his internet service provider.  (*Id.*)

At the end of the conference call, the DLA's FOIA Officer offered to send the file to Plaintiff on a CD, which could be sent to him that day.  (*Id.* ¶ 9.)  She also informed him that the

file has been available online since 2011 and could be downloaded directly from the DLA Logistics Information Services FOIA eReading Room in the exact format and record layout that had been provided to Plaintiff since at least 2008.[3]  (*Id.*)  Plaintiff declined both alternatives.  (*Id.*)

After the call, a DLA IT Specialist submitted a "Trouble Ticket" to the DISA Consolidated Communications Center ("DISA CCC").  (Larsen Decl. ¶ 2, Dkt. No. 68-1.)  She made the request "to ensure that no DLA or DoD firewall/proxy was interfering with the FTP transmission."  (*Id.* ¶ 3.)  The DISA CCC determined that neither the network, nor a firewall/proxy server rule was causing the failure and recommended that that Plaintiff be contacted "regarding the FTP server owner's system."  (*Id.* ¶ 4.)

The ticket was transferred from Level 4 personnel to Level 3 personnel, engineers who have an understanding of the DISA network architectures and are experts in information transfers.  (Mansfield Decl. ¶ 10.)  Between January 29, 2014 and January 31, 2014, the transmission "was attempted again with DISA personnel on the line at least three times."  (*Id.*)  The DISA determined that Plaintiff's computer sent a reset code to the DISA computer after only a few megabytes of data had been transferred and that the receipt of this code terminated the transmission.  (*Id.*; Thomas Decl. ¶ 2, Dkt. No. 68-1.)  The "DISA could not identify any government system cause for the transmission error."  (Mansfield Decl. ¶ 10.)  According to the final disposition of the Trouble Ticket, the "resolution to this issue resides with the customer of the FTP server not DISA/CCC."  (Thomas Decl. ¶ 5.)

On February 6, 2014, a second conference call was held with the same participants present during the first call.  (*Id.* ¶ 11.)  The purpose of the call was to discuss the results of the DISA test transmissions.  (*Id.*)  Plaintiff did not agree with the results, insisting that DISA security changes were to blame, and he recommended that the DISA or the DLA hire a contractor to solve the issue.  (*Id.*)  Plaintiff again declined to receive the CAGE Code File on a CD or to download it from the FOIA eReading Room.  (*Id.*)

After the second conference call concluded, the DLA FOIA Officer discussed Plaintiff's

---

[3] The file available on the FOIA eReading Room is identical to the file Plaintiff currently seeks. Hall Decl., Dkt. No. 71-1.

3

suggestion to hire a contractor with the DLA Headquarters FOIA liaison. (*Id.*) They decided that the FOIA Officer should not pursue obtaining funding or seeking authority to hire additional technical personnel for the sole benefit of a private person given that the record is publicly available in the FOIA eReading Room, and the failed transmissions could not be attributed to the agency. (*Id.*) On March 6, 2014, the DLA FOIA Officer sent Plaintiff a final letter closing his FOIA request. (*Id.* ¶ 12.) His appeal was denied by letter dated March 28, 2014. (*Id.*)

On June 1, 2014, the DLA FOIA Officer received a letter regarding additional attempts that were made to determine the potential causes of the transmission failure. (*Id.* ¶ 13.) The agency again determined that the transmission failure was not a result of any agency action or any security protocols in the network. (*Id.*)

On April 28, 2015, the DLA FOIA Officer arranged another conference call to discuss the attempted FTP transfer of the CAGE Code File. (*Id.* ¶ 14.) Plaintiff participated in the call on the condition that the DISA be directly involved with the transmission attempt. (*Id.*) The agency accommodated that request, and the conference call participants included a TDP Technician from DLA Logistics Information Services, DISA CCC personnel, the Information Systems Security Manager, the alternate Systems Security Manager, an IT Specialist, and a DLA Systems Administrator, all of whom had 15-33 years of experience in the IT field. (*Id.*) On April 29, 2015, two attempts were made to transfer the CAGE Code file, and both failed after approximately 3-4 megabytes of information were transferred. (*Id.*)

On April 29, 2015, the DLA FOIA Officer and agency counsel spoke with Plaintiff. (*Id.* ¶ 15.) During the call, Plaintiff suggested that a connection/computer be created outside the firewall, that the agency use error codes for diagnostics by looking up the explanation for the error code, and that a failed handshake was preventing the transfer. (*Id.*)[4] These suggestions were shared with DISA personnel and IT Support, and it was determined that the error code is a generic, non-specific error code that did not assist in diagnosing the incomplete transmission and that the

---

[4] At some point, Plaintiff also suggested that the DLA send the file to DLA Transaction Services, a separate entity, so that it could transmit the file to him. Def.'s Mot. at 5. That proposed solution was not viable because Plaintiff has declined to execute the necessary commercial interface agreement. *Id.*

4

handshake and all necessary connections were made. (*Id.* ¶ 18.) With respect to Plaintiff's suggestion regarding the creation of a separate system outside the agency firewalls, the DLA FOIA Officer determined that the FOIA eReading Room is such a system, and that complying with Plaintiff's suggestion could potentially require expenditures of tens of thousands of dollars. (*Id.* ¶ 19.) No further efforts were made to supply Plaintiff with the CAGE Code File. (*Id.* ¶ 20.)

### 2. The DoDAAC File

On May 8, 2014, Plaintiff requested a copy of the Department of Defense Activity Address Code ("DoDAAC") File, also pursuant to the FOIA. (Teer Decl. ¶ 3 & Ex. A, Dkt. No. 68-1.)

The DoDAAC is a component of the DoDAAD, which "is comprised of both DoDAAC and Routing Identifier Code (RIC) identifiers in an interactive relational database serving as a single authoritative source of identification, routing, and address information for authorized users, including Military Components and Agencies, participating Federal Agencies, authorized contractors, and authorized special program activities such as state and local governments." (*Id.* ¶ 4 & Ex. B.) "A DoDAAC is a six-character, alpha-numeric code that uniquely identifies a unit, activity, or organization within the DoDAAD. A unit, activity, or organization may have more than one DoDAAC for different authority codes or purposes." (Defs.' Opp'n, Ex. C ¶ C1.1.2.1.)

The DLA acknowledged receipt of Plaintiff's request on May 12, 2014. (Teer Decl. ¶ 5.) In its acknowledgement, the DLA notified Plaintiff that his request had been placed in "the complex queue." (*Id.*) Plaintiff responded to the acknowledgment, stating that if he did not receive a response by June 5, 2014, he would amend his complaint in federal court to incorporate the DoDAAC file. (*Id.* ¶ 6.) The DLA emailed Plaintiff on May 14, 2014 with an explanation of the complex queue. (*Id.* ¶ 7.) In his response to that message, Plaintiff stated that he did not consent to an extension of the FOIA processing timeframe. (*Id.* ¶ 8.) Plaintiff filed an appeal on June 5, 2014. (*Id.* ¶ 12.) Plaintiff then amended his complaint to include a cause of action relating to the DoDAAC File. (Am. Compl., Dkt. No. 16.)

On December 18, 2014, the Director of Administration for the Department of Defense signed a determination that the DoDAAD is exempt from disclosure under 5 U.S.C. § 552(b)(3) because it qualifies as critical infrastructure security information within the meaning of 10 U.S.C.

§ 130e.  (Defs.' Mot., Ex. E.)  The Director's determination indicated that the contents of the DoDAAD are sensitive for a number of reasons.  (*Id.*)  For example, the Director stated that "DoDAACs are created to support sensitive operations and to facilitate the business process associated with them," and DoDAACs for certain locations (such as DOD installations and ports, deployed units, ships, embassies, and war reserve equipment) include names of employees and Service members as well as duty station addresses.  (*Id.*)

The determination also provides:

> In addition, a DoDAAC could be used in an unauthorized way whereby the internal controls of the Agency can be circumvented and appropriations obligated without the proper authority being involved in the process. A DoDAAC is very much like a credit card number which, in the wrong hands, can be used to spend money without the rightful "owner" of the code (i.e., the entity with authority to use the code) being aware that the Agency's appropriations are being spent. Individuals have been prosecuted who have used a DoDAAC to purchase items (i.e., televisions) for personal gain. Therefore, effective management, control, and use of DoDAACs by all DoD Components is critical to ensure DoD fiscal responsibility.
> Moreover, the public interest in disclosure of the DoDAAD is minimal. FOIA requests for the DoDAAD are made by commercial entities with commercial interests. Therefore, the public interest consideration in the disclosure of this information does not outweigh preventing the disclosure of the information.

(*Id.*)

### B.     Procedural background

Plaintiff filed his original complaint against the Department of Defense ("DOD") and the Defense Logistics Agency ("DLA") on April 16, 2014.  (Compl., Dkt. No. 1.)  Plaintiff then filed a motion for leave to file an amended complaint, which the Court granted as unopposed.  (Pl.'s Mot. for Leave to File Amended Compl., Dkt. No. 18; Aug. 5, 2014 Order, Dkt. No. 19.)

In the amended complaint, Plaintiff alleges violations of the FOIA based on his requests for the CAGE Code File and the DoDAAC file.  (FAC ¶¶ 5-37, 38-58.)  Plaintiff filed his cross-motion for summary judgment on September 16, 2015.[5]  (Pl.'s Mot. Summ. J. ("Pl.'s Mot."), Dkt.

---

[5] In his opening brief, Plaintiff addresses whether Defendants properly placed his request for the DoDAAC file in a complex queue. *See* Pl.'s Mot. at 9.  He does so in connection with his arguments that the claim relating to the file was administratively exhausted. *See id.* at 10.  As Defendants do not seek summary judgment based on a purported failure to exhaust administrative remedies, the Court need not address Plaintiff's arguments on the issue.  Additionally, Plaintiff has provided two declarations—his own and that of Steven Marriott.  Snyder Decl., Dkt. No. 63; Marriott Decl., Dkt. No. 63.  The Court has not relied on these declarations to the extent they

6

No. 63.) Defendants filed their cross-motion on September 17, 2015. (Defs.' Mot. Summ. J. ("Defs.' Mot."), Dkt. No. 68.) On September 30, 2015, Plaintiff filed his opposition, and Defendants' opposition followed on October 1, 2015. (Pl.'s Opp'n to Defs.' Mot. Summ. J. ("Pl.'s Opp'n"), Dkt. No. 70; Defs.' Opp'n to Pl.'s Mot. Summ. J. ("Defs.' Opp'n"), Dkt. No. 71.) Both parties filed their replies on October 8, 2015. (Pl.'s Reply to Defs.' Opp'n ("Pl.'s Reply"), Dkt. No. 72.) Defs.' Reply in Support of Defs.' Mot. Summ. J. ("Defs.' Reply"), Dkt. No. 73).

On October 30, 2015, the Court ordered the parties to provide supplemental briefing. (Oct. 30, 2015 Order, Dkt. No. 74.) Defendants filed their supplemental brief on November 13, 2015, and Plaintiff filed his response to Defendants' supplemental brief on December 1, 2015.[6] (Defs.' Supp. Br., Dkt. No. 76; Pl.'s Supp. Br., Dkt. No. 77.) The Court held a hearing on the cross-motions on December 17, 2015.

## II.   LEGAL STANDARD

### A.   The FOIA

"Congress enacted [the] FOIA to overhaul the public-disclosure section of the Administrative Procedures Act . . . ." *Milner v. Dep't of Navy*, --- U.S. ---, 131 S. Ct. 1259, 1262, 179 L. Ed. 2d 268 (2011); *see also Dep't of Air Force v. Rose*, 425 U.S. 352, 360 (1976). The intent behind the FOIA was to "clos[e] the loopholes which allow agencies to deny legitimate information to the public." *U.S. Dep't of Justice v. Tax Analysts*, 492 U.S. 136, 150 (1989) (citations and quotations omitted). Its purpose was to "ensure an informed citizenry, vital to the functioning of a democratic society, needed to check against corruption and to hold the governors accountable to the governed." *John Doe Agency v. John Doe Corp.*, 493 U.S. 146, 152, (1989) (citations and quotations omitted). Accordingly, the FOIA mandates a "strong presumption in favor of disclosure," with "disclosure, not secrecy, [being its] . . . dominant objective . . . ." *U.S. Dep't of State v. Ray*, 502 U.S. 164, 173 (1991); *Rose*, 425 U.S. at 361.

---

purport to offer expert opinions on the technological issues raised in this case, the DOD's internal policies, or other matters that exceed the scope of proper lay opinion.

[6] In his supplemental brief, Plaintiff asks that "the Court forward the Deleney [*sic*] Declarations which he provided under OATH and penilty [*sic*] of purjury [*sic*] of the laws of the Commonwealth of Virginia to the Virginia Attorney General for investigation and or prosecution for purjury [*sic*]." Pl.'s Supp. Br. at 4. That request is denied.

"At the same time, the FOIA contemplates that some information can legitimately be kept from the public through the invocation of nine 'exemptions' to disclosure." *Yonemoto v. Dep't of Veterans Affairs*, 686 F.3d 681, 687 (9th Cir. 2012) (citing 5 U.S.C. § 552(b)(1)-(9)); *see also Tax Analysts*, 492 U.S. at 150-51 (agency must disclose records unless the records may be withheld pursuant to one of the enumerated exemptions listed in § 552(b)); *Lion Raisins, Inc. v. U.S. Dep't of Agriculture*, 354 F.3d 1072, 1079 (9th Cir. 2004) (the FOIA requires full agency disclosure except where specifically exempted). The FOIA provides for nine statutory exemptions, and they are narrowly construed. *See Lion Raisins*, 354 F.3d at 1079 (quoting *John Doe Agency*, 493 U.S. at 152).

### B. Summary judgment

Summary judgment is the proper avenue for resolving a FOIA case. *See, e.g., Nat'l Wildlife Fed'n v. U.S. Forest Service*, 861 F.2d 1114, 1115 (9th Cir. 1988). Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).

To prevail on a motion for summary judgment in a FOIA case, an agency must demonstrate that, drawing all reasonable inferences in the light most favorable to the requester, there is no genuine issue of material fact with regard to the agency's compliance with the FOIA, both in terms of conducting a search reasonably calculated to uncover all relevant documents and withholding only those documents or pieces of information that fall within one of the specified exemptions. *Lahr v. Nat'l Transp. Safety Bd.*, 569 F.3d 964, 986 (9th Cir. 2009); *Kamman v. IRS*, 56 F.3d 46, 49 (9th Cir. 1995); *Steinberg v. Dep't of Justice*, 23 F.3d 548, 551 (D.C. Cir. 1994).

### III.   DISCUSSION

### A. The CAGE Code File

Plaintiff does not dispute that Defendants have made the CAGE Code File available to him. Rather, he complains that his "computer is unable to read the CD." (Pl.'s Mot. at 15.) He apparently tried this "15 years ago." (*Id.*) He also claims that the file available on the eFOIA website is "un-usable" because it does not contain "the **contact name, initial filing date, last update date** and **nine(9)** additional **SIC** codes . . . ." *Id.* (emphasis in original).

8

Defendants, however, have provided a declaration from Janae Hall, a Tailored Products Technician for DLA Logistics Information Services. That declaration provides:

> 2. In my capacity as a tailored data products technician I compile and forward data files including specifically in this instance in response to a FOIA request by Mr. Richard Snyder for an updated copy of the Commercial and Government Entity (CAGE) code file. Mr. Snyder routinely makes this request on a quarterly basis. This data pull is accomplished executing a "JCL" or job control language program to copy the monthly H4/H8 (CAGE) file from a virtual tape dataset to a "regular" dataset. This dataset is then compressed using a utility called PKZIP into a binary dataset. This binary dataset is then Ftp'd via DISA computers to Mr. Snyder's AS/400 (IBM) computer.
> 3. The H4H8.zip file in the E-FOIA reading room is the identical H4/H8 zip file that is sent to Mr. Snyder. The http://www.logisticsinformationservice.dla.mil/foia/foia_reading.aspx is the same as the LPDV.MIGNOW.OCDH4H8.O001.p01 file that is in the JCL that was used to transfer the data to Mr. Snyder's server. To the best of my knowledge information and belief, this is the same file in the PUBLOG and the reading room. Please see the attached email dated September 25, 2015 regarding the identical files.
> 4. Upon the request of Counsel, I had researched certain data elements that Mr. Snyder said were missing from the H4/H8 file. The extra elements Mr. Snyder claims were missing were never in the H4H8. He will, however, find the data elements he is looking for, in the CAGE to Established Date & Changed Date Cross Reference (Produced monthly), which is contained in the last FLIS file in the E-FOIA Reading Room. In addition, according to the SIC table and by the SIC Sequence Indicator, there are only up to 4 SICs per CAGE. The following query resulted in only 4 SICs per CAGE . . .

(Hall Decl., Dkt. No. 71-1.)

Despite this declaration, Plaintiff stills asks that the Court order Defendants to "FTP the CAGE Code file to Richard Snyder directly, via DASSO, via DAPS or in the alternative to put Snyder's FOIA request on the DLIS e-commerce reading room so Snyder can retrieve it." (Pl.'s Supp. Br. at 5.)

Plaintiff's position is unavailing. As Defendants argue, now that Plaintiff has the CAGE Code File, his first claim for relief is moot. (*See* Defs.' Reply at 5.) "[P]roduction of all noexempt material, 'however belatedly,' moots FOIA claims." *Papa v. United States*, 281 F.3d 1004, 1013 (9th Cir. 2002) (footnote omitted); *see also Carter v. Veterans Admin.*, 780 F.2d 1479 (9th Cir. 1986) (plaintiff's prayer for injunctive relief directing agency to provide documents he requested was mooted when agency voluntarily mailed copies to him); *Am. Small Bus. League v. U.S Dep't of Homeland Sec.*, No C. 10-4138 SBA, 2011 WL 835925, at * 2 (N.D. Cal. Mar. 4, 2011)

(dismissing claim where the defendant provided plaintiff with unredacted version of previously redacted documents); *see also Hill v. U.S. Air Force*, 795 F.2d 1067, 1069 (D.C. Cir. 1986) ("Hill has already gained access to the [requested document] and his claim in this respect is consequently moot."). Here, Defendants have offered to provide the CAGE Code File on CD, and the file is available the eFOIA Reading Room. In fact, Plaintiff has already accessed the eFOIA Reading Room and FTP'd the file to himself. At the hearing, Plaintiff suggested that he would have done so sooner had he known that the information he seeks was contained in more than one file on the eFOIA Reading Room. Now that Ms. Hall's declaration informs him of this fact, he may retrieve any information he may be missing. Under these circumstances, FOIA does not require anything more.

Accordingly, with respect to the CAGE Code File, Defendants' motion for summary judgment is GRANTED, and Plaintiff's motion for summary judgment is DENIED.[7]

### B.    The DoDAAC File

Defendants argue that the Director has determined that the DoDAAC, is "critical infrastructure security information" and is properly withheld pursuant to FOIA exception 5 U.S.C. § 552(b)(3) and 10 U.S.C. §130e, which provides the agency the authority to withhold from the public disclosure certain sensitive military information. (Defs.' Mot. Summ. J. at 5, 6.) Plaintiff, of course, disagrees. (Pl.'s Mot. at 24.) He argues that, at a minimum, Defendants should be able to produce a sub-set of unclassified DoDAACs. (*Id.*)

To establish the structure of the DoDAAD, of which DoDAACs are a component, Defendants rely in part on two declarations from Thomas Delaney, a DLA Supply Systems Analyst and the DoDAAD Administrator, who has expert knowledge in the architecture of the DoDAAD and the DoDAAD's database file structure. (1st Delaney Decl. ¶¶ 1-2, Dkt. No. 73-1; 2d Delaney Decl. ¶¶ 1-2, Dkt. No. 76-1.) In his first declaration, he states that "[n]either the Defense Logistics Management Standards Office (DLMSO), nor the DLA Organization

---

[7] Because the Court has based this part of its decision on grounds unaffected by Plaintiffs' objections to the declarations offered by Defendants, those objections are OVERRULED AS MOOT. Moreover, the Court need not reach Defendants' argument that Plaintiff's requests go beyond business as usual and impose a significant burden on the agency's personnel and resources.

responsible for DoDAAD access (DLA Transaction Services) owns, possess, maintains, holds, or keeps an independent or separate file that lists the Department of Defense Activity Address Codes." (1st Delaney Decl. ¶ 3.) He further states that "[n]either DLMSO, nor DLA Transaction Services, have ever created, owned, possessed, maintained, held, or kept an independent or separate file that lists the Department of Defense Activity Address Codes." (*Id.*) In his second declaration, Mr. Delaney adds that "[i]f the DoDAAD [were] thought of as a spreadsheet, which it is not, that spreadsheet would have over 325,000 rows of data, and each row would include over 80 columns, amounting to over 4,000 characters per row." (2d Delaney Decl. ¶ 3.)

While Plaintiff describes Mr. Delaney as someone who "does not have a clue about what he is talking about," has "difficulty understanding the English language," and "LIED in his declaration, this Court must "accord substantial weight to an affidavit of an agency concerning the agency's determination as to technical feasibility . . . and reproducibility." *See Mann v. United States*, No. 6:14-cv-01774-AA, 2015 WL 6123981, at * 2 (D. Or. Sept. 14, 2015) (quoting 5 U.S.C. § 552(a)(4)(B)). While Plaintiff notes that the Defense Logistics Manual ("DLM") describes the DoDAAD as an interactive, relational database, he has not offered a declaration or affidavit that rebuts Mr. Delaney's statements that the DoDAACs themselves are not maintained as a separate computer file. Additionally, while he cites to an outdated version of the DLM for the proposition that the DoDAAD and the DoDAAC are two different computer files, the cited provision merely states that the "DoDAAD is comprised of both Department of Defense Activity Code (DoDAAC) and Routing Identifier Code (RIC)." (Pl.s Mot., Ex. C ¶ C2.1.2). It does not, however, state that those two components are two distinct computer files. (*See id.*)

Plaintiff would have Defendants manually sort through the massive DoDAAD database, pull individual DoDAACs, and create an entirely new document. FOIA, however, imposes no such requirement on an agency. *See* 32 C.F.R. 286.4(g) ("There is no obligation to create, compile, or obtain a record to satisfy a FOIA request."); *see also LaRoche v. U.S. SEC*, 289 Fed. App'x 231 (9th Cir. 2008) ("An agency is not required to create new documents in order to satisfy a FOIA request.") (citing *Kissinger v. Reporters Comm. for the Freedom of the Press*, 445 U.S.

11

136, 151-52 (1980)).  Accordingly, as it concerns the purported DoDAAC file, Defendants' motion for summary judgment is GRANTED, and Plaintiff's motion for summary judgment is DENIED.[8]

### IV.    CONCLUSION

For the reasons set forth above, Defendants' cross-motion for summary judgment is GRANTED, and Plaintiff's cross-motion for summary judgment is DENIED.

**IT IS SO ORDERED**.

Dated: 12/18/15

_____
KANDIS A. WESTMORE
United States Magistrate Judge

---

[8] Because Defendants are entitled to summary judgment on this ground, the Court need not address the additional argument that Defendants may withhold DoDAACs as critical infrastructure information within the meaning of 10 U.S.C. § 130e or that the purported DoDAAC file should be produced in some redacted form.

12